IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD A. KUHN,              :
                              :
        Plaintiff             :    CIVIL NO. 4:10-CV-2614
                              :
    vs.                       :
                              :
MICHAEL J. ASTRUE,            :
COMMISSIONER OF SOCIAL        :    (Judge Rambo)
SECURITY,                     :
                              :
        Defendant             :

## MEMORANDUM AND ORDER

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Richard A. Kuhn's claim for social security disability insurance benefits and supplemental security income benefits.  For the reasons set forth below we will affirm the decision of the Commissioner.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly

referred to as the "date last insured."  It is
undisputed that Kuhn met the insured status requirements
of the Social Security Act through December 31, 2011.
Tr. 9, 11 and 126.[1]

Supplemental security income is a federal income
supplement program funded by general tax revenues (not
social security taxes).  It is designed to help aged,
blind or other disabled individuals who have little or
no income.  Insured status is irrelevant in determining
a claimant's eligibility for supplemental security
income benefits.

Kuhn was born in the United States on February
15, 1960. Tr. 120.  Kuhn completed the 10th grade in 1977
and can read, write, speak and understand English. Tr.
135 and 142.  At some point after withdrawing from high
school, Kuhn obtained a commercial driver's license.
Tr. 212.  Kuhn's past relevant employment[2] was as a

_____

1.  References to "Tr.___" are to pages of the
administrative record filed by the Defendant as part of
his Answer on March 8, 2011.

2.  Past relevant employment in the present case means
work performed by Kuhn during the 15 years prior to the
date his claim for disability was adjudicated by the
(continued...)

2

paving machine operator, dump truck driver and building

maintenance worker. Tr. 40.  The paving machine operator

position was classified as skilled, medium work; the

dump truck driver position as unskilled, medium work;

and the building maintenance position as semi-skilled,

medium work.[3] Id.

_____

2.  (...continued)
Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.  The terms sedentary, light and medium work are
defined in the Social Security regulations as follows:

(a) *Sedentary work*. Sedentary work involves
lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like
docket files, ledgers, and small tools.
Although a sedentary job is defined as one
which involves sitting, a certain amount of
walking and standing is often necessary in
carrying out job duties.  Jobs are sedentary if
walking and standing are required occasionally
and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no
more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to
10 pounds.  Even though the weight lifted may
be very little, a job is in this category when
it requires a good deal of walking or standing,
or when it involves sitting most of the time
with some pushing and pulling of arm or leg
controls.  To be considered capable of
performing a full or wide range of light work,
you must have the ability to do substantially
all of these activities.  If someone can do
                                    (continued...)

Kuhn claims that he became disabled on September 9, 2008, because of a severe heart attack.[4] Tr. 136. He also claims he "can't walk very far without having to rest" and "can't lift or carry anything." Id. Kuhn also claims that as a result of the heart attack he suffered a cognitive impairment. Tr. 29-30, 41, 158 and 315. He contends that he has problems with his memory and that his Full Scale IQ score has decreased by 15 points. Id.

Records of the Social Security Administration reveal that Kuhn had earnings in 1978 and 1979, 1981

---

3.  (...continued)
      light work, we determine that he or she can
      also do sedentary work, unless there are
      additional limiting factors such as loss of
      fine dexterity or inability to sit for long
      periods of time.

      (c) *Medium work*.  Medium work involves lifting
      no more than 50 pounds at a time with frequent
      lifting or carrying of objects weighing up to
      25 pounds.  If someone can do medium work, we
      determine that he or she can do sedentary and
      light work.

20 C.F.R. §§ 404.1567 and 416.967.


4.  Kuhn testified that he suffered the heart attack on September 8, 2008. Tr. 25.

through 2004, and 2007 through 2009.  Tr. 124 and 127.
In the last 15 years Kuhn's annual income did not exceed
$13,000.00. Id.  The record reveals that Kuhn worked for
a paving company for a brief period after he suffered
the heart attack. Tr. 26-27.  In 2009, Kuhn had reported
earnings of $351.00 from Welch's Paving & Sealcoating,
Carlisle, Pennsylvania. Tr. 124.  Kuhn's last reported
earnings are from 2009. Id.  Kuhn also received $1606.00
in unemployment compensation benefits during the 1st
quarter of 2009; $1752.00 during the 2nd  quarter; and
$438.00 during the 3rd quarter.[5] Tr. 125.

---

5.  An individual can only collect unemployment
compensation if the individual is able and willing to
accept work. 43 P.S. §801(d)(1). Also, a person who
only works part-time is ineligible for unemployment
compensation if he or she refuses full-time work when
it becomes available. Maintaining Eligibility and Re-
qualifying After Ineligibility, Pennsylvania Department
of Labor & Industry, http://www.portal.state.pa.us/
portal/server.pt?open=514&objID=599971&mode=2 (Last
accessed Jan. 11, 2012).  The fact that Kuhn collected
unemployment compensation after his  disability onset
date of September 9, 2008, suggests that he represented
that he was able and willing to accept full-time
employment. Such a representation is inconsistent with
a claim of total disability.

On September 22, 2008, two weeks after suffering the heart attack, Kuhn protectively filed an application for social security disability insurance benefits and an application for supplemental security income benefits. Tr. 51-52 and 112-123.[6]  On March 11, 2009, the Bureau of Disability Determination[7] denied Kuhn's applications. Tr 53-62.  On April 14, 2009, Kuhn requested a hearing before an administrative law judge. Tr. 63-64.  This hearing was held on February 16, 2010.[8] Tr. 20-48.  On March 9, 2010, the administrative law judge issued a decision denying Kuhn's applications for benefits. Tr. 9-16.  On March 25, 2010, Kuhn filed a request for

---

6.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

7.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 54 and 59.

8.  At the administrative hearing, Kuhn testified that he was collecting unemployment compensation benefits. Tr. 28.

review of the administrative law judge's decision with
the Appeals Council of the Social Security
Administration. Tr. 4-5. On October 18, 2010, the
Appeals Council concluded that there was no basis upon
which to grant Kuhn's request for review. Tr. 1-3.
Thus, the administrative law judge's decision stood as
the final decision of the Commissioner.

On December 22, 2010, Kuhn filed a complaint in
this court requesting that we reverse the decision of
the Commissioner and award him benefits, or remand the
case to the Commissioner for further proceedings. (Doc.
1.)

The Commissioner filed an answer to the
complaint and a copy of the administrative record on
March 8, 2011. (Docs. 7, 8.)  Kuhn filed his brief on
April 20, 2011, and the Commissioner filed his brief on

May 23, 2011. (Docs. 9, 10.)  The appeal[9] became ripe

for disposition on June 9, 2011,

when Kuhn elected not to file a reply brief.

**STANDARD OF REVIEW**

        When considering a social security appeal, we

have plenary review of all legal issues decided by the

Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474

F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc.

Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999);

Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.

1995).  However, our review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to

determine whether those findings are supported by

"substantial evidence."  Id.; Brown v. Bowen, 845 F.2d

1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993).  Factual findings which are

supported by substantial evidence must be upheld. 42

---

9. Under the Local Rules of Court "[a] civil action
brought to review a decision of the Social Security
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38
(3d Cir. 2001)("Where the ALJ's findings of fact are
supported by substantial evidence, we are bound by those
findings, even if we would have decided the factual
inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700,
704 (3d Cir. 1981)("Findings of fact by the Secretary
must be accepted as conclusive by a reviewing court if
supported by substantial evidence."); <u>Keefe v. Shalala</u>,
71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270
F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894
F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such
relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" <u>Pierce v. Underwood</u>,
487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co.
v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v.
Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008);
<u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a
mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the

decision of the Commissioner must scrutinize the record
as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d
Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407
(3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff
must demonstrate an "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be
expected to result in death or which has lasted or can
be expected to last for a continuous period of not less
than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under
> a disability only if his physical or mental
> impairment or impairments are of such severity
> that he is not only unable to do his previous
> work but cannot, considering his age, education,
> and work experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which
> he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if
> he applied for work.  For purposes of the
> preceding sentence (with respect to any

individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an impairment or combination of

_____

10.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. §§ 404.1510 & 416.910.

11.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) & 416.920(c). If a claimant has no

(continued...)

impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if

_____

11.  (...continued)
impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) & 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 & 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).


12.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 & 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an

―――――――――――

13.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Kuhn's medical records, some of his educational records, and a report of a psychological evaluation completed in February 2010.

On September 9, 2008, at 9:55 a.m., Kuhn arrived ambulatory[14] at the Carlisle Regional Medical Center complaining of chest and arm pain, shortness of breath and sweating. Tr. 184.  A physical examination and various diagnostic tests were performed, including blood work and an EKG. Tr. 184-186.  A physical examination revealed that he was in moderate distress, he was sweating and pale, and his blood pressure was elevated at 149/105. Id.  The results of the EKG were abnormal

---

14.  The hospital record indicates the following: "Arrival Mode: Walked." Tr. 184.

and the clinical impression was that Kuhn had suffered an "acute inferior ST segment elevation myocardial infarction," i.e., a heart attack. Tr. 185, 190 & 197. Kuhn was treated with a nitroglycerine drip, aspirin, Plavix and heparin. Tr. 186.  At 10:35 a.m. Kuhn was transferred to Holy Spirit Hospital, Camp Hill, for further treatment. Tr. 187.

At Holy Spirit Hospital, Kuhn was examined and treated by Jeffrey Mandak, M.D., a cardiologist. Tr. 277-278.  A coronary angiography revealed a one hundred percent occlusion (blockage) of the right coronary artery. Tr. 194 & 277.  The examination further revealed stenosis (narrowing) of the Left Anterior Descending ("LAD") coronary artery.[15] Tr. 194.  An echocardiogram

---

15.  There are three major coronary arteries that supply oxygen and nutrients to the heart muscle: The Left Anterior Descending ("LAD"), Circumflex ("Circ") and the Right Coronary Artery ("RCA"). Coronary Heart Disease, The University of Chicago Medical Center, http://www. uchospitals.edu/online-library/content=P00207 (Last accessed Jan. 12, 2012).

revealed that Kuhn's left ventricle ejection fraction[16]

was in the thirty percent range.  Tr. 194 & 203.

The occlusion of Kuhn's right coronary artery

was successfully treated with a balloon catheterization

and stent implantation. Tr. 199-200.  Kuhn was

discharged from the hospital in good condition on

September 12, 2008. Tr. 194-196.  The discharge summary

prepared by Dr. Mandak stated in pertinent part as

follows:

> The patient has a history of alcohol and tobacco
> abuse.[17]  He was told that he needs to refrain
> from both of these substances.  Continued abuse
> would likely lead to progression of his disease
> and an early death. He certainly understood what
> I was saying, and I hope he takes this

---

16. "Ejection Fraction is a measurement of the
percentage of blood leaving your heart each time it
contracts. . . .Because the left ventricle is the
heart's main pumping chamber, ejection fraction is
usually measured only in the left ventricle (LV). A
normal LV ejection fraction is 55 to 70 percent."
Martha Grogan, M.D., Ejection fraction: What does it
measure?, MayoClinic.com, http://www.mayoclinic.com/
health/ejection-fraction/AN00360 (Last visited Jan.
12, 2012).

17. Prior to the heart attack Kuhn was smoking "over
one pack per day and drink[ing] alcohol heavily
according to his family." Tr. 197.

seriously.  An echocardiogram was done showing that his ejection fraction actually appeared globally and diffusely depressed in the 30% range.  I suspect that he has an alcoholic cardiomyopathy[18] on top of his acute inferior infarct.

At the time of discharge, the patient was ambulating well and feeling well.

*    *    *    *    *    *    *    *    *    *    *

The patient was told to avoid alcohol and smoking.  He was encouraged to enroll in alcohol counseling or possibly Alcoholics Anonymous to help refrain from continued alcohol abuse.

He was told not to drive for ten days.  He was told not to return to heavy lifting until we see him in follow-up.  He may need short-term disability coverage during that period.

In about six to eight weeks, I would like to perform a stress test to assess the possible significance of the LAD disease as well as to reassess his LV function after he has time to recover from his acute infarct.  If his ejection fraction remains less than 35%, then we may need

_____

18.  Cardiomyopathy is disease of the heart muscle. Dorland's Illustrated Medical Dictionary, 274 (27th Ed. 1988).  Alcoholic cardiomyopathy is defined as "a congestive cardiomyopathy resulting in cardiac enlargement and low cardiac output, occurring in chronic alcoholics[.]" Id.

18

to consider prophylactic ICD[19] implantation.
Tr. 194.  At the time of discharge, a follow-up
appointment was scheduled with Dr. Mandak for October 6,
2008. Tr. 195.

On September 22, 2008, Dr. Mandak completed on
behalf of Kuhn a document entitled "Pennsylvania
Department of Public Welfare Employability Assessment
Form." Tr. 213-215.  In that document Dr. Mandak stated
that Kuhn was temporarily disabled from any gainful
employment for less than twelve months commencing on
September 9, 2008. Id.  The form, however, did not
detail Kuhn's functional abilities, such as his ability
to walk, stand, sit, carry and lift. Id.

_____

19.  "ICD" is an abbreviation for Implantable
Cardioverter Defibrillator, "an electronic device that
constantly monitors your heart rhythm. When it detects
a very fast, abnormal heart rhythm, it delivers energy
to the heart muscle. This causes the heart to beat in
a normal rhythm again." Implantable Cardioverter
Defibrillator, Cleveland Clinic, http://my.cleveland
clinic.org/heart/services/tests/procedures/icd.aspx
(Last accessed Jan. 12, 2012).

On September 25, 2008, Kuhn was interviewed with respect to his application for disability benefits by B. Snyder, a Field Officer at the Social Security Administration. Tr. 132-134.  Snyder, based on this face-to-face interview, concluded that Kuhn had no difficulty with hearing, reading, breathing, understanding, concentrating, talking, answering questions, sitting, seeing, using his hands and writing. Tr. 133.  Snyder did state that Kuhn "was slow to stand and walk." Tr. 133.

On October 13, 2008, Kuhn had a follow-up appointment at Dr. Mandak's office in Carlisle. Tr. 211-212.  Kuhn was examined by Heather Metzger, a Certified Registered Nurse Practitioner. Id.  The report of that appointment states that Kuhn was "convalescing nicely" and that he "had no further episodes of chest discomfort." Tr. 211.  Also, Kuhn denied having any lightheadedness, dizziness, edema, near syncope, or

syncope,[20] and he stated that his blood pressure readings taken at home on a daily basis were in the range of "100s-110s/50s-60s." Id.  The results of a physical examination were essentially normal. Id.  Kuhn's blood pressure at this appointment was 128/60 and his heart rate "70 and regular." Id.  It was noted that the catheterization site had healed. Tr. 212.  The "Impression and Plan" section of the report of this appointment states in part as follows:

> Mr. Kuhn appears to be stable from a cardiovascular standpoint . . . As stated in Dr. Mandak's discharge letter, it was recommended that he undergo stress testing approximately six to eight weeks from the time of his discharge to assess the significance of the residual disease in his left anterior descending artery as well as to reassess his left ventricular systolic function.  We are going to scheduled this around October 23 or October 24.  Given that Mr. Kuhn works in the construction business and drives dump truck, he will require this reevaluation, particularly of his left ventricular systolic function, given his CDL license.

---

20.  Snycope is fainting or a temporary loss of consciousness. Dorland's Illustrated Medical Dictionary, 1628 (27th Ed. 1988).

> At this point, I have instructed him that he is not allowed to lift more than 25 pounds.  We have encouraged him to engage in cardiac rehab, but, unfortunately, given his current financial status, he does not feel that this is a feasible option.
>
> I have asked him to have a 24-hour Holter monitor[21] completed around the time of his stress test. . . .
>
> He will have a follow-up office visit with Dr. Mandak for routine reevaluation shortly after all his tests are completed.

Tr. 212.  On October 23, 2008, Kuhn had the nuclear stress test and placement of the 24-hour Holter monitor. Tr. 208-210.

During the nuclear stress test Kuhn demonstrated "good exercise tolerance, completing 9 minutes 59 seconds stage III on the modified Bruce protocol" and attained a maximum work load of 10.8 METs.[22]  Kuhn had no

---

21.  "A Holter monitor is a machine that continuously records the heart's rhythms. The monitor is usually worn for 24-48 hours during normal activity." Holter monitor (24h), MedlinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003877.htm (Last accessed Jan. 12, 2012).

22.  METs is an abbreviation for metabolic equivalents,
(continued...)

symptoms of chest pain and his left ventricular ejection

fraction was normal at 55%. Tr. 209.  The results of the

24-hour Holter monitor revealed "sinus rhythm with rare

PACs and PVCs,[23]  a single short paroxysm of atrial

------

22.  (...continued)
that is the multiples of resting oxygen uptake.  The
ability to exercise to 10 METs is consistent with "a
good exercise tolerance."  Mark D. Darrow, M.D.,
Ordering and Understanding the Exercise Stress Test,
American Academy of Family Physicians,
http://www.aafp.org/afp/1999/0115/p401.html (Last
accessed Jan. 12, 2012). Kuhn was 48 years of age on
the date of the stress test. According to one formula
developed by exercise researchers, Kuhn's target MET
level on that date was 9.42[14.7-(0.11 x Kuhn's age in
years)] and reaching the target MET level is
considered "clearly good" and evidences "[h]igh
fitness." Howard LeWine, M.D., How Do You Know If
You're Fit?, Aetna InteliHealth (Last reviewed by
Faculty of Harvard Medical School, Jan. 4,2011),
http://www.inteli
health.com/IH/ihtIH/WSIHW000/9273/24261/454067.html?d=
dmtHMSContent#gauge (Last accessed Jan. 12, 2012).
Kuhn surpassed his target MET level.

23. "PACs" are premature atrial contractions, "early
extra beats that originate in the atria (upper
chambers of the heart). They are harmless and do not
require treatment." Heart Disease and Abnormal Heart
Rhythm (Arrhythmia), WebMD,
http://www.webmd.com/heart-
disease/guide/heart-disease-abnormal-heart-rhythm
(Last accessed Jan. 13, 2012).  "PVCs" are premature
ventricular contractions.  The ventricles are the two
(continued...)

fibrillation lasting 9 beats"[24] which "did not correlate
with the noted symptomatology."[25] Tr. 208.

On November 16, 2008, Kuhn had an appointment
with Dr. Mandak. Tr. 242-243.  Dr. Mandak in the report
of that appointment stated that since suffering the
heart attack Kuhn was "doing very well." Tr. 242.  Dr.
Mandak noted that Kuhn was "active walking and hunting

_____

23.  (...continued)
lower chambers of the heart.  A PVC is "the skipped
heartbeat we all occasionally experience. In some
people, it can be related to stress, too much caffeine
or nicotine, or too much exercise. But sometimes, PVCs
can be caused by heart disease or electrolyte
imbalance . . . [I]n most people, PVCs are usually
harmless and rarely need treatment." Id.

24.  Paroxysmal atrial fibrillation is an intermittent,
irregular, rapid heartbeat that may last seconds or
days. Atrial Fibrillation, emedicinehealth, http://www.
emedicinehealth.com/atrial_fibrillation/article_em.htm
(Last accessed Jan. 13, 2012).

25.  The patient during the 24-48 hours is to record in
a diary any cardiac symptoms, such as chest pain,
shortness of breath, palpitations and lightheadedness.
Holter monitor (24h), MedlinePlus, A service of the
U.S. National Library of Medicine, National Institutes
of Health, http://www.nlm.nih.gov/medlineplus/ency/
article/003877.htm (Last accessed Jan. 13, 2012).  The
instances of PACs, PVCs, and atrial fibrillation did
not correspond to any symptoms recorded by Kuhn.

without any chest pain, dyspnea,[26] orthopnea,[27] PND,[28]
palpitations, lightheadedness, syncope, or edema." Id.
(emphasis added.)  Dr. Mandak stated that Kuhn's "recent
stress test was good with excellent exercise capacity
without symptoms or EKG changes" and that the "Holter
monitor showed no atrial fibrillation." Id.
He further noted that Kuhn reported blood pressure
readings at home in the range of "115-120/60-70." Id.
The results of a physical examination were essentially
normal except Kuhn did have an elevated blood pressure
at 150/90. Id.  Dr. Mandak in the "Assessment/Plan"

---

26. Dyspnea is "difficult or labored breathing."
Dorland's Illustrated Medical Dictionary, 520 (27th Ed.
1988).

27. Orthopnea is "difficulty breathing except in an
upright position." Dorland's Illustrated Medical
Dictionary, 1192 (27th Ed. 1988).

28. "PND" is an abbreviation for paroxysmal nocturnal
dyspnea, i.e., recurring difficulty breathing at night
which awakens the patient. Richard N. Fogoros, M.D.,
Paroxysmal Nocturnal Dyspnea (PND), About.com,
http://heartdisease.about.com/od/lesscommonheartproblem
s/g/Paroxysmal-Nocturnal-Dyspnea-Pnd.htm (Last accessed
Jan. 13, 2012).

section of the report of his appointment stated in
pertinent part as follows:

> Richard's cardiomyopathy has improved. That
> certainly is good news for him.  His stress test
> show no evidence for compromise from his LAD
> territory.  I will plan to see him back again in
> 6 months.  We will repeat a stress test in 1
> year. . . .
>
> His blood pressure was up a bit today, but has
> been well controlled at home. . . .
>
> Richard is starting to <u>look for a new job.  He
> has no restrictions with regard to driving, but
> I did tell him to avoid heavy lifting of
> anything greater than 40 lbs</u>, especial given his
> residual LAD disease. . . .
>
> I have advised him to cut out the alcohol and
> smoking completely.

Tr. 242-243 (emphasis added).

During Kuhn's treatment at Holy Spirit Hospital
for the heart attack, he was evaluated by a cardiac
rehabilitation nurse, and she recommended that Kuhn have
cardiac rehab. Tr. 253.  Kuhn declined rehab at that
time because of lack of insurance but stated that he had
contacted social services regarding financial
assistance. <u>Id.</u>  On or about November 21, 2008, the

cardiac rehab nurse contacted Kuhn again regarding rehab
and learned that Kuhn was approved for medical
assistance in early October. Id.  Kuhn told the cardiac
rehab nurse that "Dr. Mandak told him that he is 'doing
very well and does not need cardiac rehab.'" Id.  Kuhn
told the nurse that he had "decided to forgo the
program."[29] Id.

   On February 2, 2009, Kuhn was examined by Ronald
Vandegriff, D.O., on behalf of the Bureau of Disability
Determination. Tr. 217-224.  During that examination,
Kuhn told Dr. Vandegriff that he smokes "less than a
pack of cigarettes a day" and "drinks alcohol on an
occasional basis." Tr. 218.  The results of a physical
examination were completely normal, including full
muscle strength, except Kuhn's blood pressure was
elevated at 146/84. Tr. 218-219.  Dr. Vandegriff

---

29. During the administrative hearing held in this
case, Kuhn was asked by the administrative law judge
about his involvement in cardiac rehabilitation. Tr.
24. Specifically, Kuhn was asked if Dr. Mandack had
recommended cardiac rehabilitation. Kuhn stated that
he did not remember. Id.

concluded that Kuhn had the capacity to engage in a limited range of sedentary work. Tr. 221-222.  Dr. Vandegriff concluded that Kuhn could sit a total of eight hours with a sit/stand option and stand and walk one hour or less during an eight-hour workday. Id.

On February 17, 2009, Harshadkumar Patel, M.D., reviewed Kuhn's medical records on behalf of the Bureau of Disability Determination and concluded that Kuhn could perform medium work. Tr. 225.

On May 18, 2009, Kuhn had a follow-up appointment with Dr. Mandak. Tr. 244-245.  Dr. Mandak noted that Kuhn "has been doing pretty well though he is still smoking about one-half pack a day" and was "still drinking some wine but has really cut down on his alcohol intake[.]" Tr. 244.  At that appointment Kuhn denied "any chest pain, dyspnea, orthopnea, PND, lightheadedness, syncope, or edema." Id.  The results of a physical examination were essentially normal except Kuhn's blood pressure was elevated at 158/90. Id. Under the "Assessment/Plan" section of the report of

this appointment, Dr. Mandak stated that Kuhn "clinically seems to be doing well" and Kuhn was "looking for a job." Id. (emphasis added).  Dr. Mandak schedule a follow-up appointment in six months. Id.

On or about December 3, 2009, Kuhn had what appears to be a one-time appointment with Frederick A. Thaler, a physician's assistant, at Sadler Health Center, Carlisle. Tr. 307-308.  The primary purpose of this visit was to have disability forms filled out for the Pennsylvania Department of Public Welfare. Tr. 287-289.  Mr. Thaler in the Public Welfare form stated in a conclusory manner that Kuhn was temporarily disabled from December 2, 2009, until January 20, 2011.  Tr. 288.

On December 14, 2009, Dr. Mandak completed a "Medical Source Statement of Ability to do Work Related Activities (Physical)." Tr. 293-298.  Dr. Mandak stated that Kuhn could frequently lift and carry up to twenty pounds[30] and continuously use his hands and feet while

_____

30.  The ability to lift and carry twenty pounds frequently exceeds the requirements of light work.

working, including pushing, pulling and handling. Id.
Dr. Mandak also indicated that Kuhn could not work in
extreme heat or cold. Id.  Dr. Mandak did not provide
specific limits regarding Kuhn's ability to sit, stand
or walk but merely noted that those activities could be
performed "as tolerated." Id.  There is no indication
that Kuhn had an appointment with Dr. Mandak on December
14, 2009.

The final medical record relates to an
appointment Kuhn had with Dr. Mandak on December 22,
2009. Tr. 312-313.  The report of that appointment
indicates that Kuhn complained of "some dyspnea on
exertion" and that "[w]hen he was out hunting this year[31]
he had to stop more frequently." Tr. 312.  Kuhn denied
chest pain or dyspnea at rest and denied having
palpitations, lightheadedness, syncope, edema,
orthopnea, and PND. Id.  Dr. Mandak stated that Kuhn
"[u]nfortunately" was "still smoking about a half a pack

---

31.  From this statement we conclude that Kuhn was
engaging in hunting in November and December 2009.

per day" and that he "still drinks wine." Id.   The
results of a physical examination were normal, except
his blood pressure was elevated at 144/88. Id.  In the
"Assessment/Plan" section of the report of this
appointment, Dr. Mandak stated the following:

> Unfortunately, Richard still has some symptoms
> which may be a little bit worse than back in
> May. . . I did advise him to avoid heavy
> exertion and specifically to avoid lifting
> anything greater than 40 pounds . . . I plan to
> to see him back in 3 months. Once again he was
> told to stop smoking.

Tr. 312-313.

There are two school records contained within
the administrative record setting forth IQ test results.
Tr. 171 & 173.  The first is a record from Carlisle
Public Schools relating to Kuhn's educational
development from kindergarten through 6th grade which
reveals IQ testing on three occasions. Tr. 171.  At age
six, months when Kuhn was attending kindergarten, he was
administered an IQ test. Id.  The type of IQ test
administered is practically illegible; however, first
test administered appears to be the "Pintner-Cunningham

Primary Mental Test"[32] the result of which was a "Total IQ" score of 95.  <u>Id.</u>  The second test (a "Kuhlmann-Finch" test) was administered during the third grade, when Kuhn was eight years old.  The result was a "Total IQ" score of 94.  The third test (a "Kuhlmann-Finch test) was administered during the fifth grade at age 10, the result was a "Total IQ" score of 106.

       The second school record is one from the "Carlisle Secondary Schools" stating that in the seventh grade Kuhn was administered a "Kuhlmann-Finch" test and the result was a "Total IQ" of 101.  Tr. 173.

       On February 8, 2010, William D. Thomas, M.S., a licensed psychologist, conducted a psychological evaluation of Kuhn.  Tr. 314-317.  Mr. Thomas administered to Kuhn the Wechsler Adult Intelligence Scale-III test.  <u>Id.</u>  On this test Kuhn obtained a Full

---

32.  This test is "a non-verbal group test for use in the classification of kindergarten and primary pupils." APA PsycNet, American Psychological Association, http://psycnet.apa.org/journals/edu/14/4/256a/ (Last accessed Jan. 12, 2012).

Scale IQ of 86.  Tr. 315.  However, Mr. Thomas stated
that this score was "a probable spurious estimate of his
intelligence" because of a 15 point variance between a
Verbal IQ score of 80 and a Performance IQ score of 95.
Id.  Mr. Thomas stated that the 15 point variance
suggested that Kuhn probably had average genetic
cognitive endowment, a significant regression in
personal functioning both academic and vocational as
well as social, and an auditory processing or language
based learning disability.  However, Mr. Thomas could
not give a definitive diagnosis of a cognitive disorder
on Axis I of the multiaxial classification system of the
Diagnostic and Statistical Manual of Mental Disorders.
Tr. 316.  On Axis II Mr. Thomas found that Kuhn suffered
from a reading disorder, a mathematics disorder and a
disorder of written expression. Id.  Mr. Thomas
concluded that Kuhn was functioning at the Low Average
range of cognitive adjustment. Id.  Mr. Thomas did not
rule out Kuhn's ability to engage in "sedentary and/or

33

light duties" involving unskilled, menial type labor.
Tr. 317.

## DISCUSSION

The administrative law judge at step one of the
sequential evaluation process found that Kuhn had not
engaged in substantial gainful work activity since the
alleged disability onset date of September 9, 2008. Tr.
11.  The administrative law judge did find that Kuhn
worked after the alleged disability onset date but that
the work did not rise to the level of substantial
gainful activity.  Id.

At step two of the sequential evaluation
process, the administrative law judge found that Kuhn
had the following severe impairments: "hypertension and
status post myocardial infarction of September 2008."[33]

_____

33. An impairment is "severe" if it significantly
limits an individual's ability to perform basic work
activities.  20 C.F.R. § 404.1521.  Basic work
activities are the abilities and aptitudes necessary to
do most jobs, such as walking, standing, sitting,
lifting, pushing, seeing, hearing, speaking, and
remembering. Id.  An impairment or combination of
impairments is "not severe" when medical and other
                                        (continued...)

Id.  The administrative law judge found that Kuhn's
alleged cognitive disorder was not a medically
determinable impairment because Dr. Thomas only
suspected a 15-point drop in IQ and his "diagnosis of
cognitive disorder" was "a 'rule-out' diagnosis,[34]
indicating that it is not actually determined but simply
suspected." Tr. 11-12.

    At step three of the sequential evaluation
process the administrative law judge found that Kuhn's

---

33.  (...continued)
evidence establish only a slight abnormality or a
combination of slight abnormalities that would have no
more than a minimal effect on an individual's ability
to work.  20 C.F.R. § 416.921; Social Security Rulings
85-28, 96-3p and 96-4p.

34.  The "rule-out" diagnosis is used inconsistently by
different physicians and psychologists and the context
in which the "rule-out" diagnosis is made has to be
closely scrutinized.  The "rule-out" diagnosis can have
two different meanings.  It can mean that the
particular condition is, in fact, ruled out, i.e., the
patient is not suffering from the condition.  However,
it also can mean that further information is needed to
evaluate whether the patient is, in fact, suffering
from the condition. In the present case it is clear
that Mr. Thomas could not definitely say that Kuhn
suffered from a cognitive disorder and was of the
opinion that further evaluation was necessary to "rule-
out" that condition. Tr. 316.

impairments did not individually or in combination meet or equal a listed impairment. Tr. 12.

At step four of the sequential evaluation process the administrative law judge found that Kuhn could not perform his prior relevant work but had "the residual functional capacity to perform a limited range of light work as defined" in the regulations. The limitations required that Kuhn avoid exposure to extreme cold and heat. Tr. 12 and 42.

At step five, the administrative law judge, based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert, found that Kuhn had the ability to perform unskilled work as a conveyor line bakery worker, a potato chip sorter, and a cashier II, and that there were a significant number of such jobs in the local, state, and national economies. Tr. 15. The vocational expert also testified to a significant number of sedentary jobs which Kuhn could perform. Tr. 44.

The administrative record in this case is 317 pages in length and has been thoroughly reviewed by the court.  The administrative law judge did an adequate job of reviewing Kuhn's vocational history and medical records in his decision. Tr. 9-16.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. (Doc. 10, Br. of Def.)

Kuhn argues that the administrative law judge erred by (1) failing to find a cognitive decline as a severe impairment; (2) failing to fully and fairly develop the record by not ordering additional testing to develop Kuhn's allegation of cognitive decline; (3) failing to accept sitting and standing limitations which could have precluded at least some of the jobs cited by the vocational expert as within Kuhn's limitations; and (4) failing to find Kuhn fully credible.  We have thoroughly reviewed the record in this case and find no merit in Kuhn's arguments.

Kuhn's first argument is premised on the report of Mr. Thomas and the testimony of the vocational expert who opined that an individual who suffered a 15 point decrease in his or her IQ could not engage in competitive employment. Tr. 46.  The administrative law judge concluded that there was insufficient evidence to find that Kuhn had such a decrease in his IQ score.

No treating or examining physician or psychologist provided a statement that Kuhn had a severe Axis I cognitive impairment. As noted previously, Mr. Thomas's diagnosis was a rule-out diagnosis. Furthermore, as for the alleged decrease in Kuhn's IQ score, Mr. Thomas stated that the Full Scale IQ score of 86 was "a probable spurious estimate of [Kuhn's] intelligence." Tr. 315.  Also, Mr. Thomas did not conclude that Kuhn was totally disable. Tr. 315 & 317. In fact, Mr. Thomas stated that Kuhn could engage in unskilled, menial labor type positions. Id.

The Social Security regulations require that an applicant for disability benefits come forward with

38

medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §§ 404.1512(c) & 416.912(c).  Kuhn failed to provide such evidence.  The administrative law judge did not err in failing to find that Kuhn suffered from a medically determinable severe cognitive impairment.

As for the Kuhn's second argument that the administrative law judge failed to adequately develop the record, the regulations of the Social Security Administrative provide guidance as to when an administrative law judge is required to obtain further evidence. 20 C.F.R. §§ 404.1519a, 416.919a, 404.1527(c)(3) & 416.927(c)(3).  Under the regulations, an administrative law judge is required to  further develop the record when (1) in the administrative law judge's opinion the evidence though consistent, taken as

whole, is insufficient to support a decision, and (2) the administrative law judge after weighing the evidence cannot reach a conclusion about disability. Id.  Neither situation appears to be present in this case.  The administrative law judge had the treatment records from Dr. Mandak, the report and assessment of Dr. Vandegriff, the report of Dr. Patel,  and the report of Mr. Thomas, all of whom suggested that Kuhn was capable of some degree of work.  None of the physicians questioned Kuhn's mental ability to engage in unskilled work.  Dr. Patel concluded that Kuhn could engage in the physical requirements of medium work.  Dr. Mandak's opinion permitted at least sedentary work and it is not inconsistent with a capability to engage in light work. Dr. Vandegriff concluded that Kuhn could engage in sedentary work.  We are satisfied that the administrative law judge had sufficient evidence before him to make a decision.[35]

---

35.  Furthermore, the burden was on Kuhn to establish disability.

Kuhn's third argument in essence is that the administrative law judge should have concluded that Kuhn was limited to sedentary work, i.e., the administrative law judge should have accepted the sitting, standing and walking limitations set forth in the assessment of Dr. Vandegriff.  The administrative law judge was not obligated to accept the assessment of Dr. Vandegriff in toto.  Dr. Patel concluded that Kuhn could engage in medium work.  The administrative law judge appropriately relied in part on the opinion of Dr. Patel and the records from Dr. Mandak to conclude that Kuhn could engage in the physical requirements of light work.

Kuhn's final argument is that the administrative law judge should have found the testimony of Kuhn fully credible.  The administrative law judge stated that Kuhn's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work. Tr. 13.  The administrative law judge was not required to

accept Kuhn's claims regarding his limitations. <u>See</u> <u>Van</u>
<u>Horn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir.
1983)(explaining that credibility determinations as to a
claimant's testimony regarding the claimant's
limitations are for the administrative law judge to
make).  It is well-established that "an [administrative
law judge's] findings based on the credibility of the
applicant are to be accorded great weight and deference,
particularly since [the administrative law judge] is
charged with the duty of observing a witness's demeanor
. . . ."  <u>Walters v. Comm'r of Soc. Sec.</u>, 127 f.3d 525,
531 (6th Cir. 1997); <u>see</u> <u>also</u> <u>Casias v. Sec'y of Health &</u>
<u>Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We
defer to the ALJ as trier of fact, the individual
optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge
observed Kuhn when he testified at the hearing on
February 16, 2010, the administrative law judge is the
one best suited to assess the credibility of Kuhn.
Furthermore, there are several items in the record which

raise questions about Kuhn's credibility, including improvement in Kuhn's medical condition referenced in Dr. Mandak's records and Kuhn's ability to engage in walking and hunting.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


S/SYLVIA H. RAMBO
United States District Judge


Dated: January 27, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD A. KUHN,           :
                           :
        Plaintiff          :    CIVIL NO. 4:10-CV-2614
                           :
    vs.                    :
                           :
MICHAEL J. ASTRUE,         :
COMMISSIONER OF SOCIAL     :    (Judge Rambo)
SECURITY,                  :
                           :
        Defendant          :

## ORDER AND JUDGMENT

In accordance with the accompanying memorandum,
**IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of the Commissioner and against Richard Kuhn as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Richard Kuhn disability insurance benefits and supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.


<u>S/SYLVIA H. RAMBO</u>
United States District Judge


Dated: January 27, 2012